Mr. Kneedler. Mr. Chief Justice, and may it please the Court, the Administrative Procedure Act expressly exempts interpretive rules from the requirement for notice-and-comment rulemaking, and the APA defines rulemaking as an agency process for formulating rules that are not subject to interpretation. Under the D.C. Circuit's Paralyzed Veterans Doctrine, however, once an agency gives a definitive interpretation of a rule, it cannot significantly modify that interpretation without going through notice-and-comment rulemaking.   Mr. Kneedler. Kennedy, there's a rule that should guide our decision here that in a close case an interpretive rule is preferable to a regulation or vice versa, because it seems to me it would help you in your case if you said that interpretive rules serve an important function and the paralyzed veterans decision is an incentive not to adopt an interpretive interpretation. Kneedler, I think that's absolutely correct. First of all, the question of whether this is an interpretive rule is not before the Court. That was conceded below, but it is of critical importance for agencies to be able to issue interpretive rules, and this is reflected in the passage of the APA itself. The committee reports show that the not imposing obstacles to agencies issuing interpretations was designed to encourage them to let the public know what their interpretations of the statutes and rules that they had mentioned. Kennedy, if I'm an agency head and you're my attorney, do you advise me that interpretive rules are often preferred to regulations? Well, I think it depends. And again, this is a principal purpose of what the APA did. The APA did not prohibit an agency from going through notice and comment rulemaking or other public participation in the case of an interpretive rule. It left to the agency the decision whether to do that. So in some circumstances, the agency might choose to have very specific regulations. In other circumstances, the agency may choose to have interpretations. Scalia, these things have changed so much, mainly because of this Court's interpretations. Was it not the envision by the original APA that substantive rules had to have notice and comment because they would indeed be reviewed by courts on the basis of abuse of discretion? I mean, you know, whether it's 25 centimeters or 250 centimeters for a particular substantive rule, there's no way for a court to say that that's right or wrong. Whereas, it was certainly envisioned by the original APA, was it not, that interpretive rules would not be given any deference by the courts? And that's why there didn't have to be notice and comment, because the APA says in so many words that all issues of law shall be decided by the court. Yes, but the question of deference, when an agency or, excuse me, when a court is deciding a question of law, that takes into account the agency's interpretation. This is demonstrated by Chevron, because if the APA says, well, you can say that, but that's not what anybody thought when the APA was passed. Well, as we point out in a reply brief, it was understood that there would be principles of deference to agency interpretations. And beyond that, with respect to interpretations of legislative regulations,  And so the principle of courts giving deference to an agency's interpretation of its own regulations. Ginsburg. What about, Mr. Kneedler, this particular kind of interpretation? Is this an unusual situation, or in classifying employees for purposes of the Fair Labor Standards Act, has the agency changed its mind about an initial classification? I mean, here we have the agency has taken different views on whether loan offices qualify as administrative offices. Is the Fair Labor Standards Act subject to this kind of review and revision by the department? Kneedler, Well, there haven't been that many instances of changes. But one of the purposes of giving an agency the authority to interpret a statute and its regulations is to take into account evolving circumstances. The certain job descriptions, for example, may not even have existed at the time or may have existed in a very different way at the time a regulation was adopted or a prior interpretation was given. But I do think it's important to recognize that the Fair Labor Standards Act is a situation in which Congress has actually contemplated that the agency would give interpretations and might change them. As we point out in our briefs. Roberts, Was there a particular basis for the change in this case? Kneedler, Yes. The agency in 2010 principally thought that the 2006 interpretation was simply erroneous, because the 2006 interpretation had relied on Section 203B, which was part of a list of examples of applying the general standards in Section 200. And it, I think, basically overlooked or didn't give significance to the fact that that regulation itself. Roberts, Was there a change in the leadership of the agency between those two interpretations? Kneedler, Yes, there was. Yes, there was a change in the leadership. But the agency didn't. Roberts, And the agency didn't give a more thorough explanation of the changes in the administration? Kneedler, Yes. The change in the administration. But the agency. Roberts, Isn't that a more likely explanation? Kneedler, Well, the agency gave a very thorough explanation of the reasons for the change. Of course, of course. Roberts, And they hadn't done, they hadn't addressed the same issues the first time in 2006? Kneedler, They had addressed the same issues, but the court, or excuse me, the 2006 administrative, or excuse me, opinion letter, gave what in 2010 the agency thought was an unduly narrow view of what sales activities would consist of. And I, and it's instructive to look at this Court's decision in Christopher. Christopher had to do with the interpretation of another part of this same exemption for outside salesmen. But the Court there recognized that various functions are incidental to sales activities, and even if they don't necessarily encompass the direct face-to-face activity, preparing for that meeting and doing research on that particular customer's view is part of sales activity. The 2006 opinion letter did not really take that view. It really just said that the face-to-face interaction was part of sales. Sotomayor Was the 2006 advice contrary to prior advice? Kneedler, Yes. There had been opinion letters issued in 1999 and again in 2001, which, yes, 2001, which had concluded that the mortgage loan officers were not within the exemption in the 2006 interpretation. Scalia. So this is the second flip-flop? Maybe we shouldn't give deference to agency interpretations of its own regulations. That would solve the problem of this case for me, it would be easy. Kneedler, Well, the question of deference, again, is another thing that is not before the Court. The Respondent challenged this 2006 case. Scalia. I understand it's not before the Court, but my perception of what is before the Court would be altered if I didn't think that courts had to give deference to these flip-flops. Kneedler, Well, the question of how this Court's decisions had different formulations about how a change of position may be factored into the question of deference. We point this out in our reply brief. In the Thomas Jefferson Hospital case, the Court suggested that change in interpretations would matter. But then later, again in Christopher, the Court suggested that the way a change in positions would be taken into account is that it would be some indication of whether the agency had given fair and considered or whether it was a product of fair and considered judgment today. Alito, In this case, didn't the government say explicitly that its interpretation would be entitled to controlling deference? Kneedler, Well, that was an invocation of the Seminole Rock standard, yes. And under Seminole Rock, and our deference, and our deference, and our deference, Alito, If it has controlling deference, does it have the force of law? Kneedler, No, it doesn't. And I think controlling is just describing the consequence of a court going through the interpretive process. Same thing under Chevron. If the Court has to go through its analysis of deciding whether the agency has interpretive authority and whether the interpretation is reasonable, if all that's satisfied, then the agency's interpretation controls. But it's not controlling. Alito, It's a formal difference, but as a practical matter, do you think there's much of a difference? Kneedler, I think there's an important difference, because a legislative rule, which has the force and effect of law, itself prescribes duties for the regulated party. You can be sanctioned or be held liable for violating the regulation itself. That's not true for an interpretive rule. An interpretive rule is giving the agency's view of what some other provision of law means, and it's that other provision, be it a statute or a regulation. Sotomayor, Mr. Kneedler, that was, that's what's been troubling me. I have looked at the academic debate on how to identify a legislative or from an interpretive rule. I'm not quite sure that we don't need to get into that here, but I was troubled by your answer to Justice Kennedy, because you were suggesting that there is no standard by which you decide what becomes a legislative rule and what becomes an interpretive rule. Kneedler, I think what I meant to say is that there is no standard. No, what I think what I meant to say is that there is no standard. Sotomayor, you were saying a, if you were advising on this issue that some you would suggest go by rule and some you, by legislative rule and some you'd suggest go by interpretive rule. I don't. I certainly didn't mean to suggest that there's no difference between the two. There's a very fundamental difference. But there's a fundamental difference. In the way I described it, it's just that there could be situations in which an agency might decide to be very detailed in a regulation and there are situations in which the agency might not want to. Under the Fairway Provisions Act, there is no standard. Kagan Can I ask about that, Mr. Kneedler? Because it seems to me that part of what's motivating the Respondent's position and their amici's position, and I'm not sure that this maps on very well to the paralyzed veterans doctrine, but part of what's motivating it is a sense that agencies more and more are using interpretive rules and are using guidance documents to make law, and that there is, it's essentially an end run around the notice and comment provisions. Now, whether that has anything to do with paralyzed veterans or not, I mean, what would the government say is the correction for that or the remedy for that or, I mean, because the government is sort of asking for it all. It's asking for a lot of deference always, it's asking for the removal of the paralyzed veterans doctrine. It's asking for a pretty strict demarcation between interpretive and legislative rules. So what's the solution to the problem that I think the Respondents are basically identifying? Kneedler, Okay. And that, my answer to that question has a number of parts. First of all, in this specific statute, Congress has given a pretty good answer, which is 29 U.S.C., the Portal-to-Portal Act, Provision 259, which says that a party cannot be held liable for good-faith reliance on an interpretation issued by the agency. And that applies whether or not, the statute expressly says, that has been amended or rescinded. So the Portal-to-Portal Act specifically contemplates that there will be changes in interpretation. Kennedy, you make a point of that at page 4 of your brief, but I don't wish to interrupt Justice Kagan's line of questioning, but it seems to me that we have to assume that there will be many other cases in which there's no safe harbor provision. Kneedler, Right. Kennedy, And you have the retroactivity. Kneedler, Right. No, that's absolutely right. But here there is a safe harbor provision. Congress addresses the concern. Kennedy, But you don't ask us to confine our reasoning to that kind of case. Kneedler, Right. And so the — with respect to agency guidance and that sort of thing, the APA contemplates that agencies will develop their own procedures, and, in fact, agencies have done that in recent years. There are agencies that seek public participation when they're developing guidance documents, sub-regulatory guidance documents. It's the way the FDA proceeds. And OMB has oversight of these things and can require and bring some consistency to the way agencies interpret matters. With respect to the question of deference, I was starting to answer this question before. This Court's decisions specify some different possibilities in the way deference might play into a change of position, but in Kennedy v. Plan Administrator, the Court said that a change of position is no reason in itself to disregard the agency's position. And then in Long Island Care, the Court said, at least where there's no unfair surprise. So what way do you think that's going to play into a change of position? Ginsburg Suppose a court had given, quote, controlling deference to the 2006 rule. Does that make any difference? Kneedler, No. I think by analogy to Brand X, if the agency gives a different interpretation to the regulation, that change should be given effect by a reviewing court. Sotomayor But you go back to Justice — answering Justice Kagan. How do you address the fundamental concern, which is that agencies are bypassing the notice and public comment by using interpretive rules when they should be using legislative rules? Kneedler First of all, I mean, I think some may have that impression. I don't, you know, I don't think that there's an empirical basis. Sotomayor Assume the impression is true. That's why I asked you to define when one has to be used and when the other can't be used. Kneedler Well, the D.C. Circuit's decision in the American Mining Congress has been given a lot of attention as dividing between what's an interpretive rule and what's a regulation. And the — I think the principal guide there is whether, in the absence of the rule, would there be a standard to which the regulated party could be held. And here there unquestionably is. The Fair Labor Standards Act applies, and the regulation itself, dealing with the exemption, which Congress has expressly authorized the Secretary to define, identifies who is an administrative employee by several factors. So here there's — this interpretive regulation is by no means necessary to establish a basic rule of liability. Now, there could be situations that, again, were identified in American Mining Congress and, frankly, in this Court's decision in Gonzales v. Oregon. If the agency issues a regulation that does nothing more than just parrot the statute, then the agency hasn't really accomplished anything by its regulation and its interpretive rule would not get — would not get deference. But if the agency has actually given content, even if necessarily in somewhat general terms, then that is satisfactory. And under the Fair Labor Standards Act, there are — at the time the 2004 regulations were issued, Labor estimated there were 134 million people in the workforce, approximately, I think, 26 million covered by the — what they call the white-collar exemption. It would not really be feasible for the Department of Labor to issue detailed regulations trying to identify every type of employment, every type — every sector in the economy. And so interpretive guidance is the way that the agency has done this. And, again, Congress, I think in some respects, ratified that or at least recognized its legitimacy in passing the portal-to-portal safe harbor provision, which deals not simply with regulations, but it says good-faith reliance on an interpretation does not give rise to liability, even if that interpretation is late. Scalia. But why should there be a difference? Pardon me? Why should there be a difference between the two, between the treatment of substantive rules and interpretive rules? Well, as I said, substantive rules or legislative rules themselves define how to force an effect of law. They themselves define duties and obligations. Interpretive rules, and this is in the Attorney General's manual on the APA, which this Court has repeated in Chrysler, is designed to inform the public of the agency's view of the statute. Well, not so long as — so whether it's an interpretive rule or a substantive rule, it is reviewed by a court with deference, right? We give the same — and you want us to give the same deference to both. Yes. So what the Court says about — in its substantive rule is just as much or no less law than what a court says in its interpretive rule. If the court is within the bounds of ambiguity, it is the law, and a court cannot change it. So why should there — you know, I just don't understand the difference in treatment between the two. With respect, Justice Scalia, I think that there's a critical difference, and that is that when the case goes to court, the court is deciding whether the agency's interpretation — whether to defer to the agency's interpretation or not, but ultimately it's the court that is deciding what the law is under principles of deference. So under Chevron, if the court decides that the agency's interpretation is appropriate, then it's the court that is construing the statute, and by parallel  I'm sorry I'm so late, but the — yes, you said yes, yes. You give the same degree of deference whether it's a legislative rule or an interpretive rule. Where it's a legislative rule, Congress has, through interpretation of the statute, said to the agency, you are to expand on the statute through rules. They are exercised by delegated congressional authority. And of course, we have systems for deciding what deference we'll give, and it's usually quite a lot. Where it's an interpretive rule, it's just what you said. The agency is giving its interpretation. And in that kind of case, the deference that a court will give to it, the answer has to be, though you might not accept everybody on this Court, you might not agree with it, it depends. Very often you give them that deference because they know more about the statute, about what went on in its enactment, and what Congress meant. If that's the reason, and they change their minds, I would think the deference sinks quite a lot, something it wouldn't do with a legislative rule, or after all, they have the authority to decide either way. So I agree with you. We needn't go into those matters in this case, and I surely hope we don't. But if we do, is there anything I said you disagree with? Well, yes. I think that the question of deference to an agency's interpretation, the Court has adopted. It's called Skidmore. Well, no, it's very often our deference, and Seminole Rock tracing, tracing actually throughout this Court's jurisprudence, I think it's almost 50 cases in which the Court has recited that standard. And one of the very strange things about this case is that I thought that in Smith-Klein, and I recognize that the government probably doesn't like this aspect of Smith-Klein, but that Smith-Klein basically says when it comes to our deference, if the interpretation has been unstable over time and if the interpretation has created a kind of unfair surprise for private parties, that those interpretations do not get our deference. So the very kinds of interpretations that we're talking about here, which is revised and amended interpretations, they don't get our deference in the first place. So this whole notion that we're supposed to be so worried about this because we're going to give it our deference, well, we don't. Well, I don't think Christopher is dispositive on that point. And if I could explain, there's another way to look at this, and that has to do with the giving deference, whether deference should be given to the agency's new interpretation with respect to transactions that occurred before. That's a question of retroactivity, because one could say if the agency gives a new interpretation to an existing legislative rule, that to give deference to that interpretation retrospectively is, in effect, to apply the regulation as so interpreted retroactively and not give it effect. But I don't think the fact that there's a change of position doesn't seem to us should change the deference going forward, which is really the critical point. And that's, we think, critical because the whole point of giving the agency the interpretive authority is that it is the expert, Congress has delegated to it the responsibility for fleshing out the regulatory scheme over time, and new circumstances or the agency may identify prior errors. So one way to think of it is to give the agency the interpretive authority to do that. Breyer. But that may also be an occasion to identify an error. I mean, it's not a question of giving the agency the interpretive authority to do that. Breyer. But I have to really get into this, because I think it's fascinating, and probably we could each write, you know, like a new treatise on administrative law in this subject. Is it possible to decide this case without going into the question of deference? How? Yes. As I said before, this interpretation was challenged not only under the paralyzed veterans doctrine, but also as being substantively invalid. And the district court rejected that interpretation, finding that it was clear on the basis of reading the regulations that the new interpretation was valid, and Respondent did not appeal that. So any questions of the new interpretation are simply not part of this case and should be left for another case. But going back to the question of deference, I mean, that's often the case when you have a procedural challenge. I mean, the idea is they're not challenging the particular interpretation, but you don't doubt that the agency could have come out the other way. And maybe if there had been notice and comment, they would have been persuaded that they should or that they shouldn't change the interpretation. Well, the APA itself has a mechanism to take into account that as well. The APA has a provision for petitioning an agency for rulemaking. So if the mortgage bankers here believe that, and this was a statement noted in Auer itself, that the regulated industry, their States could have petitioned the agency for a rulemaking. And agencies, that is subject to judicial review. So if there was arbitrary denial of a petition for rulemaking, that would be — that is another safety valve. Again, something built into the APA itself. And the — our principle, the basic submission here is that paralyzed veterans rests on a real misreading of the APA. And there are very strong values behind interpretive rules, as Justice Kennedy's question suggests. An agency should not be required to abide by an interpretation it believes is erroneous going forward. And also, the agency should be in a position of telling — of being truthful with the public as to what it understands the regulation to mean. I'd like to reserve the balance of my time. Thank you, Mr. Kneedler. Thank you. Ms. Hull? Mr. Chief Justice, and may it please the Court, I'd like to begin with Justice Sotomayor's question about the dividing line between interpretive rules and legislative rules in the context of what my friend, Mr. Kneedler, has said about retroactivity. I think when you consider — the government says, and it's recognized in the past, that the 2010 AI, the agency action that is at issue here, the government has said it was such a substantive change in the law that it could not be applied to the agency as it was applied retroactively. That is fundamentally inconsistent with any notion of an interpretive rule. Ms. Hull, I think that this entire case has been litigated with everybody accepting that this was an interpretive rule. Now, maybe that was wrong. Maybe you should have come in in the first instance and said, really, we think this is a legislative rule, and so it had to go through notice and comment. But you didn't do that. Everything that happened in this case happened on the view that this was an interpretive rule, and the question is what followed from that classification. Respectfully, Justice Kagan, I disagree with that — with that description. As we explain on page 46 of the red brief, what we said below was that the 2010 AI was an interpretation. An interpretation is not dispositive of whether it's a legislative or interpretive rule. Perhaps more importantly, Justice Kagan, the D.C. Circuit in its decision under review gave no indication, made no suggestion, that what it was in fact doing was subjecting a legislative rule — excuse me, an interpretive rule to notice and comment. It held, and it cited the APA, that the AI-2010 was a de facto amendment. Yes, but to the contrary, Ms. Ho. I mean, the entire paralyzed veterans' doctrine is about when interpretive rules get notice and comment, have to get notice and comment, if ever. It's not about the division line between interpretive rules and legislative rules. So when the D.C. Circuit starts citing paralyzed veteran, it's on the assumption that what we're talking about is an interpretive rule. Again, Your Honor, I would respectfully disagree with that. And I don't dispute that there is loose language in dicta and that the D.C. Circuit has not been entirely clear about that. But I think that's loose language. If you go back to paralyzed veterans itself, they deal with two arguments. The first argument is what's become known as the paralyzed veterans' doctrine. And then they say, oh, you know, there's another argument in the case, which is that this isn't an interpretive rule at all. Your Honor, I think the way that I would understand both paralyzed veterans and the D.C. Circuit is, paralyzed veterans, it looked at one argument for why what it had before it was interpretive in name only. And it said the best argument here is that this isn't an interpretive rule, it is a de facto amendment. And it's a de facto amendment. Ginsburg-Miller Why wouldn't the 2006 interpretation, which you say should have been de facto, be de facto, if it's legislative, if it's substantive, then the 2006 interpretation was equally defective because there was no notice in comment for the 2006. If you are trying to characterize the 2010 rule as not interpretive, I don't see how you can say, oh, but the 2006 rule was interpretive, especially since there were the earlier rulings the other way. What was it, the 2001 and so it seems to me that you want it to be interpretive when it favors you and you want it to be not interpretive. You want the 2006 to be interpretive because you didn't go through notice in comment,  Anderson-Miller Your Honor, I think the status of 2006 opinion, which is not before this Court, I agree with you, it's a difficult question. I think the 2006 opinion has characteristics of both legislative rules and it has characteristics of interpretive rules. The key thing for this case is the government's concession that in 2006, that opinion letter was the department's authoritative, definitive interpretation. So regardless of the status of 2006, the key thing from the D.C. Circuit's point of view in deciding whether it was a de facto amendment, and again, there's nothing in the decision under review to suggest. Ginsburg-Miller But I don't understand why we should say go back to an interpretation that didn't get, I mean, I can see you say the 2010 should have had notice in comment, but why return to an earlier position that didn't have notice in comment? I think you could say wipe it all out, start over, but I don't see how you can say the 2006 rule sticks when it has the same defect, on your view, the 2010 did. Well, again, Your Honor, we could – I think 2006, again, it's a harder question. There are characteristics that make it legislative, there are characteristics that make it interpretive. I think the key point is focusing on 2010 and perhaps one difference that would tie back to Your Honor's earlier question about the specific context of this case in the Fair Labor Act. My friend has talked about the Portal to Portal Act, about Section 259. One thing that the 2010 AI did is it repealed, it withdrew the 2006 opinion letter, which under 259 gave employers an opportunity to plead a good faith defense. In withdrawing that, the 2010 AI effectively abridged a statutory defense. And I think in that respect, the 2010 AI, I think it's a better comparison. Ginsburg. I don't follow that, because it seems that as far as the change, the – an employer who had relied in good faith on the 2006 interpretation is home free. I thought that that much was clear. Your Honor is correct, assuming, assuming that that an employer can prove good faith. But that's only from 2008. How could there not be good faith? Here's a regulation, I followed it. What more do I need to show good faith? In any particular case, the question would be good faith. I mean, an employer would have to show that it did, in fact, it reviewed, it looked. Often this is one of the more hotly litigated aspects of the litigation. But the employer would say, here's interpretive rule 2006, I followed it to the letter. What more would need to be shown? Then here's a regulation on the books, an interpretation on the books, I followed that interpretation. I thought it was clear that such an employer would not be liable for the past. Now, for the future, it's something different. Yes, Your Honor. There are several elements. That would be only from 2006 to 2010. Going forward, of course, and of course in this case in 20 – in 2008. Scalia, even for that period, I assume he would have to prove that he relied on the regulation. Yes, relied, relied on the regulation. If he did this without any knowledge of the regulation, he would not be in good faith reliance on the regulation, would he? That's correct, Justice Scalia. But I didn't imagine, and maybe I misunderstood Mr. Kneedler, he wasn't suggesting that they would go back and prosecute people who didn't happen to read the regulation but were acting in compliance with it. I guess we can ask him, but I mean, do you think that's what the government is going to do? No. No, Your Honor. I think what's significant from our perspective about the government's – the government's position that the 2010 AI should not apply retroactively is that in an amicus brief in Henry, it's in – I apologize, it's not before the Court. It's on JA 279 and 280 in the Court below. In an amicus brief in another case, the Department took the position that the AI should not apply retroactively because substantive changes in the law that do not simply say what the law according to the agency is and has always been do not apply retroactively. So our position is that, and Justice Sotomayor, wherever the line, wherever the line between interpretative is. Sotomayor, what changes what is an interpretative rule? What you're suggesting, an interpretative rule to me is an interpretative rule. Is there a statute or a regulation that you're looking at, and you're saying a statute or a regulation, I think it applies this way. You don't talk about a court amending a statute or regulation when it changes its interpretation. So even if I agree with you that it's an amendment to an interpretation, how does that make it anything else but an interpretation? I think the key point, and Justice Sotomayor, you're exactly right. If what AI 2010 truly was was simply an interpretation, simply saying here's what the regulation means and has always meant, there would not be a reason in the world not to apply it retroactively, because you would simply be saying what the law is. Sotomayor, but there is a safe harbor in this particular statute, and they're trying to comply with the meaning of the safe harbor. I understand that that's the position that the government's taken in this case, but in Henry, where what the actual argument that the government was making in that case was that the 2010 AI was entitled to our deference, that there was no unfair surprise, precisely because it could not apply retroactively. Our submission is that by saying the 2010 AI worked a substantive change in the law. Sotomayor, you keep calling it a law. It worked a substantial change in the interpretation. I'm actually quoting from the government's brief, and this is on page 280 of the JA. The government says, it is important to note, however, that when the department issues interpretations via administrator's interpretations, amicus briefs, et cetera, that do not result in a substantive change in the law, those interpretations which restate what the law according to the agency is, both before and after it's been submitted. Ms. Hill, can I take you back to what I thought was the question in this case, which has to do with the Paralyzed Veterans Doctrine? Yes. And I guess what I would like for you to do is simply to try to explain that doctrine to me, and on the view that this is a doctrine about interpretive rules, and what it says is that there are occasions when interpretive rules must be done through notice and comment, and that those occasions are when the interpretive rules make a significant revision to a stable, a prior stable interpretation. So could you explain to me just why that is so? Yes, Your Honor. And operating under the premise that you've asked me to operate under, I think it rests on the premise that where an administrative agency's, the law-making power and the power to interpret that law rest in the same hands, where the agency gives an authoritative, definitive interpretation of what its own regulation means. That meaning is, for all practical purposes, what the regulation is, such that to change that meaning is to change the regulation. I think I understand that, but it seems to me that that would apply as well to the initial interpretation as to the revised interpretation. In other words, if you really want to say an interpretation somehow changes the legislative regulation, then that happens at the moment the interpretation takes place, doesn't it? No, Your Honor, I don't think it does. I think what happens, and under the Paralyzed Veterans Doctrine, this can happen when the government issues an authoritative interpretation. In other words, it's looking at the regulation, and it's saying, this is what the regulation means. It's not changing that regulation, although certainly some interpretive rules can include changes. It is saying, this is what our regulation, the law that we made, this is what it means. And I think in a world of our deference, where there is no meaningful distinction, and certainly not from the perspective of the regulated, as to the controlling force of law accorded to the interpretation itself versus the regulation. Yes, but again, our deference actually is more strong with respect to the initial determination, the initial interpretation, than with respect to a revised interpretation. So I don't think our deference can save you from this little conundrum. The conundrum is why it is that an interpretation should be viewed as changing the regulation such that notice and comment is necessary when it's a second interpretation, but not when it's a first. Because the second, the second, the first interpretation under Paralyzed Veterans has to be authoritative. It can be authoritative, and not all interpretations are authoritative. In this case, the government conceded. It was an authoritative interpretation. In Alaska Hunters, 30 years of uniform agency practice, that was authoritative. Such that from the perspective of the regulated, the agency isn't just saying this is our authoritative interpretation. It is inviting reliance upon it such that to change, to do a 180, to take a logically inconsistent position with it at point B, that's what Paralyzed Veterans is targeting. Kennedy, but it seems to me that what you're doing is in order to make your case, you're saying that the second interpretation deserves the same deference, the same our deference as the first. And it's just as Kagan's questions, it seemed to me, highlight. You're basically running away from the Paralyzed Veterans. No, no, Your Honor. And I apologize for ---- And it seems to me odd that you would, representing your client, say, well, this second interpretation, if it stands, gets full our deference. I would say that it does. I would think that your position would be it doesn't. And I apologize, but our position regarding deference is that in a world of our deference, where the background rule, the default rule, is that the interpretation of a regulation and the regulation itself are entitled to the same level of our deference. To me, that makes sense of the Paralyzed Veterans Doctrine because, again, the difference between the regulation itself and the authoritative interpretation of it collapses. Our position ---- It may not be a bad idea to run away from Paralyzed Veterans. I mean, how is it at all consistent with Vermont Yankee? I think it's entirely consistent with Vermont Yankee in that the question in a Paralyzed Veterans case is whether a rule is legislative or interpretative. In other words, is it entitled to notice and comment rulemaking or not? It's not imposing additional requirements on to the agency. It's saying this is the line that the APA draws. And again ---- Okay. Unless it is adding procedures if you acknowledge that this is an interpretative rule. And we do not ---- we don't acknowledge that and we don't think that is the fairest reading of what the D.C. says. So it is absolutely essential to your position and to Paralyzed Veterans that this change has to be regarded as a substantive rule, right? Correct. And if we disagree with that, you acknowledge that Paralyzed Veterans is wrong? Yes. I acknowledge that. I do not think that is the fairest reading of what Paralyzed Veterans means. I mean, so I think that you've just said that Paralyzed Veterans is wrong, then. Because, I mean, the D.C. Circuit has two lines of precedent. One line of precedent is all about how to distinguish between legislative and interpretative rules. And I forget what the principal case is, but there's a four-part test, and that's what it uses. And Paralyzed Veterans it uses for a different purpose altogether, which is that when it's decided that something is an interpretative rule, there's still another question to be asked, which is whether that interpretative rule revises a previously stable interpretation. Your Honor, what I would say is that American mining, the American mining case that you're referring to, the fourth prong of that is whether the rule is an amendment. No, it's an amendment of the legislative rule. Of the regulation, yes. The regulation. And I think the best way to understand Paralyzed Veterans is it is, if you will, a variation on that in saying that you can have an amendment to a regulation. You can have a de facto amendment to a regulation. That's what this Court recognized in Guernsey. And that's what this Court recognized in Guernsey. I understand the fourth prong of American mining to be essentially the question of whether the interpretation is in conflict with the previous regulation. Yes, Your Honor. And I think Paralyzed Veterans is best understood as recognizing a variation on that. And I think that's precisely why in Paralyzed Veterans the Court went on to consider whether the rule may be legislative on any other number of prongs. But then, I mean, go back to what Justice Scalia asked you, which is that if you drop this kind of reinterpretation of Paralyzed Veterans and you assume that what we are dealing with here is an interpretative rule, then you don't think notice and comment is required. I think the APA is clear. The dividing line is between interpretative rules and legislative rules. The question in this case is whether the 2010 AI is, in fact, an interpretative rule. So what should we do? I mean, you know, that is, I concede, a more difficult and interesting question. But the question presented in your reading of it is whether notice and opportunity for comment are required when an agency issues an authoritative interpretation of a regulation that squarely conflicts with the same agency's prior authoritative interpretation. All right? That's the question presented. Okay? So we can answer that pretty quickly, I think. Now, if I'm right about that, we can leave all this for another day. And, well, I'd say, you know, you've been quoting Roehr nonstop, I would quote Mead. And I would say Mead suggests that, in fact, there are different levels and it depends and it's much more complicated than some are willing to suggest. And there we are. It did command a majority of the Court. It is an authoritative decision. And there are obviously different views among different judges about the extent to which they are the same or not. So is there any reason that we have to get into all that, which I hope the answer is no, but I think you have the best chance of thinking of a yes answer, so to speak. No, Your Honor. I don't think you need to get into all that. I think this case can be resolved, whether because the D.C. Circuit correctly applied, whether this Court agrees with the framework the D.C. Circuit adopted, or whether this Court accepts one of our alternative arguments why the 2010 AI is not an interpretive rule for the other reasons. This Court doesn't need to wade into the larger issues. You're saying that what the question presented boils down to is whether an interpretive rule that radically modifies a prior interpretive rule is a substantive rule. That's what you say the question presented boils down to. That is our submission, and we believe that is an accurate statement of what the D.C. Circuit has, in fact, been doing in its paralyzed veterans doctrine. Yes. If there are no further questions, thank you. Thank you, counsel. Mr. Leder, you have five minutes remaining. Yes. Thank you. On the last point, I mean, an interpretive rule doesn't get transformed into a substantive rule simply because a prior interpretive rule has interpreted a regulation or a statute. We have two interpretive regulation or interpretive rules that have the same form, and they're both intended by the agency to be interpretive. What do you do with the quote from your brief that she relies upon? The brief in the Henry case, I think what the agency was saying in that case is that it was acknowledging that this was a significant change in the interpretation of the regulation as applied to mortgage bankers, and therefore, it should not be given the deference should not be applied retroactively to it, which we think is an important safeguard that this Court could look to in terms of our deference, not giving our deference to the application of a regulation to prior conduct. I think if you read the whole passage, that passage in the brief was in contradistinction to a situation where an interpretive rule is simply clarifying or interpreting for the first time something that was not clear in the regulation. And in that situation, there's no problem of retroactivity because the agency is interpreting the regulation as it always, as it always meant. Mr. Kneedler, you are not going to go after employers who acted consistent with the prior interpretation between 2006 and 2010 on the ground that they didn't know about the prior interpretive regulation, are you? No. The position we took in this case below and that we took in the Henry case is that the new interpretation should not be given our deference retrospectively. So anybody — so no, we're not going to invoke the 2010 rule. Whether they knew about the regulation or not. Right. Yes, that was the point. So you're not relying on the good faith exception, right? Just on your generosity in interpreting? Well, no, it's not, it's not, it's not just generosity. I mean, it is, it is a principle, retroactivity is a principle that, that runs through this case, this Court's jurisprudence in a number of different respects, including towards the counsel. So are you, so are you saying that you would be required to avoid retroactive application even if the safe harbor provision were not in the statute? That's the position we've taken because in this case, because there is a significant change, and I think that would be the case whenever there may be, there may be special circumstances, but I think that would ordinarily be the case. But I would urge the Court not to trust that. We're going to write this down. Pardon me? We're going to write this down and quote you in future cases. No, I just, I just wanted to add a caveat to that, as I don't think it would be prudent for the Court to adopt a rule that runs across different agencies. The very existence of 259 in this case shows that this agency's programs might be different. No, the point is that's not right, because the provision you're citing requires good faith. And you told me it doesn't matter whether they know about it or not. Yes, because there was a change, but that may not be the case under all programs as the point that I was going to make. Under the Medicare program, where you have an ongoing reimbursement arrangement and you have a combination of rulemaking and adjudication, there are no private suits under the Medicare program the way there are here. The approach might be different. An interpretation of a regulation says what the regulation has always meant. So if you're saying that this can't be applied retroactively, aren't you saying that the law was changed, not simply that a correct interpretation has been restored? No, I don't think that's, again, on a parallel to Chevron. If an agency comes up with a new interpretation of a statute in Chevron, it may be some theoretical question of whether that's what the statute always meant, but this Court's deference doctrine recognizes that an agency can change that, and that change may often only have prospective effect. And so it's an accommodation of competing principles, that the very important rule to give the agency the ability to change its view going forward and protection of interests as they come back. And the interpretive rule principle is very important, which is why Congress did not impose rulemaking on it and why Vermont Yankee enforced that rule. The courts are not supposed to do that. It would deter agencies from issuing interpretations in the first place if they knew that they had to go through a cumbersome process to change it. All one has to do is look at the Medicare program that was discussed in Guernsey Memorial Hospital where there are 640 pages of regulations, the Court said, aided by the provider reimbursement manual. An agency could not be expected to go through notice and comment to modify that. Roberts. Thank you, counsel. The case is submitted.